UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Heather Woodberry, | Court File No. _____ |
| Plaintiff, | |
| v. | |
| | **COMPLAINT AND** |
| Aspen Dental Management, Inc. and | **JURY DEMAND** |
| APEO, LLC, | |
| Defendants. | |

The Plaintiff, Heather Woodberry, for her Complaint against Defendants, states and alleges as follows:

PARTIES, JURISDICTION & VENUE

1.     Plaintiff is a natural person who resides in the County of Beltrami, State of Minnesota.

2.     Defendant Aspen Dental Management, Inc., is a Delaware corporation with its principal place of business in New York.

3.     Defendant APEO, LLC is a Delaware corporation with its principal place of business in New York.

4.     Defendant Aspen Dental Management, Inc., and Defendant APEO, LLC (jointly "Aspen Dental" or "Defendant Aspen Dental") are joint employers.

5.     At all times relevant to this action, Plaintiff and Defendant Aspen Dental were "employee" and "employer," respectively, within the meaning of Minn. Stat. § 181.931.

6.      This Court has subject matter jurisdiction over this dispute under diversity jurisdiction, 28 U.S.C. § 1332, as Plaintiff and Defendant Aspen Dental are citizens of different States and the amount in controversy exceeds $75,000.00.

7.      Venue is proper under 28 U.S.C. § 1391 because the acts and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant Aspen Dental conducts business in this District.

FACTS

8.      Aspen Dental hired Plaintiff on September 16, 2019, as a dental assistant.

9.      Plaintiff was hired by Aspen Dental Regional Manager Brittany Judge ("Judge").

10.     From September 16 through October 1, 2019, Plaintiff received training at Aspen Dental's office in Duluth, Minnesota, and then was assigned to work in the office in Bemidji, Minnesota.

11.     Plaintiff primarily worked in Bemidji but regularly traveled to Aspen Dental's offices in Duluth and Baxter, Minnesota, as needed.

12.     Dr. Joseph J. Shama ("Shama") was the only dentist at Aspen Dental's office in Bemidji.

13.     Shama supervised Aspen Dental employees.

14.     Plaintiff observed that Shama often appeared to be working while under the influence of drugs or alcohol. She noticed that he regularly slurred his words, fell asleep during procedures—including while drilling a patient's tooth—was rough with patients, and insulted and threatened staff and patients.

15.     In November 2019, Plaintiff called Judge and reported Shama's behavior and apparent substance usage. Judge stated that she was aware of Shama's substance abuse but declined to address it further. Nonetheless, Shama's reckless and dangerous behavior with patients and staff continued.

16.     In December 2019, Plaintiff assisted Shama with a major surgery that involved upper anterior injections, which can be very painful. When the patient began crying in pain and became restless in the chair, Shama poked her bottom lip with his finger and yelled at her, "Be quiet! That doesn't hurt, you stop it right now!"

17.     In late January 2020, Shama performed a crown prep procedure on a different patient. During this procedure, Shama asked Plaintiff if she had a permit to carry a pistol. Plaintiff stated that she did, and, in response, Shama stated that it could be used to "thin the herd of employees." This comment was made in front of the patient and another dental assistant. Given Shama's substance use and erratic behavior, staff became concerned for their safety.

18.     Plaintiff reported Shama's conduct to Aspen Dental Office Manager Melanie Pakonen ("Pakonen"). Aspen Dental disregarded Ms. Woodberry's report without acting.

19.     While working in the Duluth office in February 2020, Plaintiff spoke to Dr. Tiffany Jonasen ("Jonasen") about Shama's substance abuse, her growing fear for patient and employee safety, and Judge's refusal to do anything about it.

20.     Plaintiff told Jonasen that she had witnessed Shama perform a root canal while seemingly intoxicated, during which Shama had perforated a tooth, resulting in the loss of the patient's tooth and the bridge, and that he offered this patient $5,000 toward

dental implants. She also reported Shama's comment that her gun could be used to "thin the herd of employees." Jonasen encouraged Plaintiff to report Shama.

21.     Following her meeting with Jonasen, Plaintiff reported Shama to the Aspen Dental Speak Up Hotline ("Hotline") and the American Dental Association ("ADA"). To both entities, Plaintiff reported Shama's substance abuse while working, his "thin the herd" comment, his hostile and threatening behavior to patients and staff, and the harm he caused patients during procedures.

22.     Under the American Dental Association's Principles of Ethics & Code of Professional Conduct at Section 2, the principle of Nonmaleficence states: "The dentist has a duty to refrain from harming the patient." Further, the Code of Professional Conduct at 2.D. on Personal Impairment states: "It is unethical for a dentist to practice while abusing controlled substances, alcohol or other chemical agents which impair the ability to practice." In addition, the Code of Professional Conduct at 3.F. on Professional Demeanor in the Workplace states: "Dentists have the obligation to provide a workplace environment that supports respectful and collaborative relationships for all those involved in oral health care." https://www.ada.org/~/media/ADA/Member%20Center/Ethics/Code_Of_Ethics_ Book_ With_Advisory_Opinions_Revised_to_November_2018.pdf?la=en

23.     Plaintiff also reported insurance fraud to the Hotline, explaining that Shama had billed for surgical procedures he never performed. For example, she reported that Shama billed for a "core and crown" procedure when he had only done the crown. Plaintiff informed Shama that she needed to change the treatment record because he did not do the core procedure. Shama yelled at Plaintiff to "leave it alone!"

24.     Plaintiff's reports to the Hotline were supposed to be anonymous. Her reports to the ADA were not anonymous. Plaintiff informed Jonasen that she had made these reports the day after she made them.

25.     About a week after Plaintiff called the Hotline, Judge came to the Bemidji office and confronted Plaintiff at the front desk about the reports. Judge repeatedly stated that they had received accusations of misconduct at the office including threats to the health and safety of workers and patients, that those accusations were blown out of proportion, and that the Hotline was "hounding her for information." Plaintiff was made to feel uncomfortable and put on the spot. It was clear from Judge's tone and directness that she knew or suspected that Plaintiff made the reports.

26.     Plaintiff admitted that she had made the reports to the Hotline and that they were accurate and not blown out of proportion. She also reported that other coworkers had witnessed Shama's intoxication and behavior but were afraid to come forward and report him out of fear for their jobs.

27.     Judge and Pakonen then called Plaintiff into Pakonen's office and closed the door. Judge warned Plaintiff to "keep what happened at the Bemidji clinic at the Bemidji clinic." Plaintiff understood this to be a threat to her job and a warning not to make reports about patient safety. She also understood that neither Judge nor Pakonen intended to act to protect patients or employees.

28.     Shama's substance abuse at work continued. On March 13, 2020, he showed up to work seemingly intoxicated again. While working on a patient, Plaintiff observed Shama repeatedly pass out and lose his balance, toppling onto the patient.

29.     Shama's harmful and reckless behavior toward patients and staff went beyond substance abuse. On several occasions, Plaintiff witnessed Shama forcefully shove the saliva ejector down patients' throats, causing them to cough and gag. While working on a patient, Shama punched the light in front of the patient with his fist in anger, almost hitting another dental assistant, Kelly.

30.     During another procedure, Plaintiff noticed an anesthetized patient was shaking and crying. The patient said her heart was racing, and she couldn't breathe. Under these conditions, the protocol is to check the patient's blood pressure and pulse, so Plaintiff applied a blood pressure cuff. Shama immediately ordered Plaintiff to remove the blood pressure cuff, ignored protocol, and stated, What are you trying to do, scare the hell out of her? Shama had administered 17 carpules of anesthetic to this patient. A patient is typically given two to three carpules during a procedure. Plaintiff counted the empty carpules, deposited them in the sharps container and noted the amount in the chart.

31.     On at least two occasions, patients experienced paresthesia following treatment by Shama.

32.     Shama and Pakonen ridiculed Plaintiff for making reports of misconduct about the Bemidji office. While at the employee lockers, Pakonen referred to Wilson as a "Biotch." After saying this, she turned to Plaintiff and said mockingly, "Oh, don't report me." Similarly, Shama taunted Plaintiff about reporting him to Lederer by repeatedly and sarcastically telling her, "I think you should call Josh."

6

33.     On March 15, 2020, Aspen Dental asked employees to continuing working through the COVID-19 pandemic. Plaintiff and her colleagues in the Bemidji office declined, citing the health risks to themselves and to patients.

34.     On March 23, 2020, Governor Walz issued an executive order indefinitely postponing all non-essential or elective surgeries and procedures, including non-emergent or elective dental care, that utilize PPE or ventilators. Thereafter, Aspen Dental told employees to apply for unemployment.

35.     On April 23, 2020, Aspen Dental notified employees to stop unemployment, as it had been approved for a PPP loan, so employees would get paid for eight weeks at 40 hours per week. Plaintiff received her first paycheck after stopping unemployment on May 8, 2020.

36.     On May 12, 2020, the Bemidji office held a video conference via Zoom with employees to discuss re-opening the office and obtaining proper personal protective equipment. Initially, Aspen Dental promised employees N95 respirator masks that would be fitted for each employee at the Sandford Health Occupational Medical Clinic in Bemidji ("Sandford OccMed").

37.     Guidance issued by the Centers for Disease Control and Prevention concerning N95 masks in the dental setting during the coronavirus disease 2019 pandemic states in part:

> During aerosol-generating procedures conducted on patients assumed to be non-contagious, DHCP [Dental Healthcare Personnel] should use an N95 respirator* or a respirator that offers a higher level of protection such as other disposable filtering facepiece respirators, PAPRs, or elastomeric

respirators, if available. Respirators should be used in the context of a respiratory protection program, which includes medical evaluations, training, and fit testing … . *A respirator is a personal protective device that is worn on the face, covers at least the nose and mouth, and is used to reduce the wearer's risk of inhaling hazardous airborne particles (including dust particles and infectious agents), gases, or vapors. Respirators are certified by CDC/National Institute for Occupational Safety and Health (NIOSH), including those intended for use in healthcare.

https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html#PPE.

38.     However, Plaintiff and other employees at the Aspen Dental Bemidji office did not receive N95 masks. Instead, they were given KN95 masks.

39.     Several days earlier, the FDA issued guidance restricting the use of KN95 masks imported from China for medical purposes.

40.     The KN95 masks given to Plaintiff and her coworkers appeared to have Chinese characters on the packaging.

41.     The office staff expressed their concerns about not having proper PPE while working with blood, saliva, and aerosol. Plaintiff reiterated those concerns in a group text with other office staff. Plaintiff included images and information stating that many KN95 masks were counterfeit or were failing to meet performance standards.

42.     Judge responded that she was "highly insulted" and that the staff could "see what it looks like to NOT come back to work for Aspen."

43.     On May 14, 2020, Aspen Dental scheduled another mandatory Zoom meeting for employees and were advised to email Aspen Dental Director of Academic and

Industry Relations Joel Lowsky ("Lowsky") with any questions or concerns about the upcoming reopening, to be addressed during the meeting.

44. The night before the meeting, Plaintiff emailed Lowsky that she and others received KN95 masks that they believed were unsafe. She reported that according to the CDC website, true N95 masks did not have earloops and are sealed around the mouth, but the masks they received had earloops, were thin and appeared to be of the type prohibited from medical use. Further, she stated that the CDC was reporting that many KN95 masks were deemed fake or unsafe. She also reported that she and other employees have compromised immune systems and wanted to return to work safely.

45. During the meeting on May 14, Lowsky failed to address Plaintiff's questions, but Dr. Ishmail, also on the call, said that staff at the Bemidji office would need N95 masks. Indeed, Dr. Ishmail later asked Pakonen in front of staff, Judge and Lederer whether Bemidji would be getting the N95 masks. Pakonen said, not yet. Both Judge and Lederer responded that they were still working on it. Lowsky emailed Plaintiff to explain that the reason he did not address her question on the call was because the Zoom meeting was open to the public.

46. Plaintiff also reported to Judge that the masks did not appear to be FDA or NIOSH certified as required by the CDC.

47. On May 15, 2020, Plaintiff traveled to Sandford OccMed to have her mask fitted and tested. Even before the test began, the person fitting the mask said it would not work because it was a KN95 mask, not an N95 mask. They ran the fit test on Plaintiff's mask and, unsurprisingly, it failed, as did the KN95 mask of co-worker Heather Moran.

9

48.     On May 17, 2020, which was the day before the office was scheduled to reopen, Judge told Plaintiff not to come back until work got busy again.

49.     On May 20, 2020, Plaintiff received a call from Pakonen informing her that she had been terminated from Aspen Dental because of "lack of work" and that she would be eligible for unemployment. When Plaintiff asked Pakonen why she was not just being laid off, Pakonen told her it was because of "corporate and benefits." Plaintiff stated that she would be willing to float between offices where dental assistants were needed, and Pakonen stated that she would put in a word for her. Plaintiff then asked Pakonen for a termination letter. Pakonen hesitated and then said she would have to ask.

50.     That same day, Plaintiff contacted Judge to better understand why she was terminated. Judge informed her that there was no need for Plaintiff as business was down. Judge then added that Plaintiff had "performance issues" and that was considered as well. Plaintiff had not been given a performance review or notified of any performance issues during her employment. She asked Judge whether she had anything in writing about any performance issues. Judge responded that Pakonen had given the documents to the human resources partner.

51.     Plaintiff then texted Pakonen to ask about her performance review and any performance issues. Plaintiff noted that she had never signed anything or reviewed a copy of any documents concerning performance.

52.     Pakonen informed Plaintiff that she was not on any formal performance action, but she could contact human resources for her employment file.

10

53.     Plaintiff learned from a coworker that before Plaintiff was terminated, Pakonen told Shama that Plaintiff had reported his behavior to the Aspen Dental Hotline. Shama told Pakonen that if Plaintiff came back to work, he would no longer work at that office. Upon information and belief, this contributed to Aspen Dental's termination of Plaintiff.

54.     As a result of Defendants' unlawful actions, Plaintiff has been harmed and lost salary and benefits and has suffered and will continue to suffer mental and emotional pain and anguish and other serious damages.

COUNT I
RETALIATION IN VIOLATION OF
THE MINNESOTA WHISTLEBLOWER ACT ("MWA")

Plaintiff re-alleges all preceding paragraphs of this Complaint.

55.     The MWA states that "[a]n employer shall not discharge … an employee … because the employee … in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law … ." Minn. Stat. § 181.932, subd. 1(1).

56.     Likewise, the MWA states that "[a]n employer shall not discharge … an employee … because the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national clinical or ethical standard and potentially places the public at risk of harm." Minn. Stat. § 181.932, subd. 1(4).

57.     Plaintiff reported violations, suspected violations, or planned violations of law when she, in good faith, made reports that Defendants were fraudulently billing patients for work not performed, causing tortious harm to patients, and failing to provide proper, safe, certified personal protective equipment to employees in violation of CDC, FDA, NIOSH and OSHA standards and regulations, including, but not limited to, those pertaining to respiratory protection, 29 CRF 1910.134.

58.     Plaintiff reported in good faith that the quality of health care services provided by Defendants violated state law and professionally recognized national clinical or ethical standards in dentistry that placed the public at risk of harm, including, but not limited to, her reports that Dr. Shama repeatedly showed up to work appearing intoxicated, threatened employees and patients, endangered patient health, committed fraud, and caused physical harm to patients. These acts violate Minnesota's ethical standards in dentistry, including, but not limited to, those stated in Minnesota Statute § 150A.08, as well as the ADA's Principles of Ethics & Code of Professional Conduct.

59.     Defendants by and through their officers and employees acting on their behalf, violated the MWA by terminating Plaintiff's employment.

60.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

<u>PRAYER FOR RELIEF</u>

Therefore, Plaintiff requests that judgment be entered against Defendants for the following:

12

a.      Declaring that Defendants' acts or omissions described in this Complaint constitute violations of applicable federal and state laws which protect Plaintiff;

b.      Enjoining Defendants and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with it, from its unlawful acts;

c.      Requiring Defendants to make Plaintiff whole for its adverse, retaliatory, and discriminatory actions with compensatory damages and with interest of an appropriate inflation factor;

d.      The Plaintiff be awarded compensatory damages in an amount in excess of $75,000.00 as established at trial.

e.      Awarding Plaintiff her attorneys' fees, costs, and disbursements pursuant to statute; and

f.      Granting other and further relief as the Court deems fair and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

Dated: September 4, 2020

s/Shawn J. Wanta
Shawn J. Wanta
Bar No. 0389164
Matthew S. Nolan
Bar No. 0390132
*Attorneys for Plaintiff*
Baillon Thome Jozwiak & Wanta LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
swanta@baillonthome.com
mnolan@baillonthome.com

14